Rel: July 12, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2024

_____

## CL-2023-0881

_____

### Fadi Alaudhi

### v.

### Stacey Marie Davis

### Appeal from Mobile Circuit Court
### (DR-21-900091)

LEWIS, Judge.

Fadi Alaudhi ("the husband") appeals from a judgment entered by the Mobile Circuit Court ("the trial court") on July 6, 2023, that, among

other things, divorced him from Stacey[1] Marie Davis ("the wife"), divided the parties' property and debts, and awarded the wife periodic alimony. The husband's sole challenge on appeal is the trial court's award of periodic alimony. We affirm the trial court's judgment.

Procedural History

On January 25, 2021, the wife filed in the trial court a complaint seeking a divorce from the husband, as well as child support, periodic alimony, alimony in gross, and an equitable division of all the assets and the debts of the marriage, such as the husband's businesses and the marital home. She also filed a motion for emergency relief in the form of a restraining order and an ex parte order awarding her possession of the marital home and custody of the parties' children. The wife's motion was granted on January 26, 2021. The trial court entered a pretrial order on January 27, 2021, requiring the parties to refrain from harassing each other; to preserve their assets and each other's access to their assets; and to "maintain the status quo as it existed during the marriage and prior

---

[1]In his notice of appeal, the husband spelled the wife's first name as "Stacy." However, according to the wife's complaint and the wife's brief, the wife's first name is spelled "Stacey." Therefore, we have used the latter spelling in this opinion.

to the decision to file for divorce to the extent possible" by paying expenses and using their automobiles as they had before.

On February 15, 2021, the husband filed an answer to the wife's complaint and to her emergency motion. On March 30, 2021, the wife, having served discovery on the husband, moved to compel the husband to respond to her discovery requests. Her motion was granted that same day. Two months later, the wife moved for sanctions against the husband, alleging that he had failed to comply with the order compelling him to respond to her discovery requests. The trial court thereafter ordered the husband to comply with the order within seven days and to appear at the trial of the divorce action to show cause as to why he should not be held in contempt, at which time, the trial court ordered, it would determine what sanctions to impose.

On October 18, 2021, the wife moved to compel the husband to respond to her discovery requests concerning, among other things, his income, businesses, and property ownership. Her motion was granted that same day. Less than one month later, however, the wife again moved for sanctions against the husband, alleging that he had failed to comply with the October 18, 2021, order. After a hearing, the trial court

3

entered an order allowing the husband 45 days to respond to the wife's discovery requests. Nearly 3 months later, the wife moved for sanctions and an order finding the husband in contempt, alleging that he had failed to comply with the 45-day deadline. The trial court set the wife's motion to be considered at a scheduling conference to be held on May 17, 2022.

On May 6, 2022, the wife moved for an order of contempt against the husband for his failure to maintain the status quo in accordance with the trial court's pretrial order. The wife's motion averred that the husband had failed to pay the mortgage on the marital home and that she had been forced to meet financial obligations for which she had not been responsible before filing the complaint for a divorce, including paying for the cost to repair her automobile.

After a scheduling conference, the trial court ordered the husband to pay a past-due mortgage payment on the marital home and to arrange for payments of the mortgage to be automatically withdrawn from his accounts. The trial court also appointed a special master to determine whether the parties had complied with the Alabama Rules of Civil Procedure throughout the discovery proceedings. Additionally, the trial court gave the parties' counsel until July 8, 2022, to file a status report

4

regarding an outstanding tax return. Thereafter, the trial date was continued several times due to the failure of the husband's accountant to prepare the husband's tax returns. Eventually, the trial court ordered the special master to investigate the accountant's delays.

On December 20, 2022, the wife moved a second time for an order of contempt against the husband based on his failure to maintain the status quo, now seeking to hold the husband in contempt for his continued failure to pay the mortgage, as well as his failure to pay several other bills that he had been paying before the divorce action. The trial court set the motion to be heard on the trial date. After a scheduling conference, the trial court ordered the husband to provide to the wife "copies of all bank statements, checks and other documentary evidence" showing the revenue and expenses of each of the husband's businesses, specifically including the tax returns that had not yet been produced. On May 18, 2023, the wife again moved for an order of contempt against the husband based on his continued failure to maintain the status quo by failing to repair her automobile. The trial court set that motion to be heard on the trial date.

A trial was held on June 13 and 14, 2023. On July 6, 2023, the trial court entered a judgment that, among other things, divorced the parties, divided the parties' property and debts, and awarded the wife periodic alimony. Specifically, the trial court's judgment awarded the parties the financial accounts in their individual names and the items of personal property in their individual possession; it also directed the parties to pay the debts in their individual names and the debts associated with the respective properties they were awarded. The judgment further provided:

> "11. [The husband] shall pay the [wife] the sum of $683.00 per month as child support.
>
> "....
>
> "14. The [wife] shall maintain medical insurance for the benefit of the minor child. The parties shall split equally any uncovered medical, dental, orthodontic, vision, counseling/therapy and/or other reasonably necessary medical expenses. ...
>
> "15. The Court finds that the husband is in contempt of court in that he has failed to comply with the Court's Pre-Trial Order [by failing to pay expenses, transferring his property without the trial court's approval to decrease his income, and impeding the wife's access to the $200,000, which was a marital asset]. ...
>
> "16. The wife is awarded a judgment against the husband in [the] amount of $121,693.54 (the Court calculated this

amount as follows: the wife's 50% share of the $200,000.00 cash in the possession of the husband, plus $14,693.54 for unpaid status quo expenses, plus $7,000.00 as a contribution towards a reasonable attorney's fee incurred herein).

"17. The wife is awarded all right, title, and interest in and to the marital residence[.] … The wife shall pay and be responsible for any mortgage indebtedness due on the marital residence[.] … The Court finds that it is equitable to award the wife all of the equity in the marital residence in light of the husband's contribution to the breakdown of the marriage, the length of the parties' marriage, and the fact that the Court is awarding all of the husband's business interests to him hereinbelow.

"18. The husband is awarded all right, title, and interest in and to any interest he may have in Select Auto, LLC, Select Auto Group, LLC, and Select Luxury, LLC. …

"19. The wife is awarded the 2015 GMC Yukon and the husband is awarded the 2018 Lexus LS500.

"….

"23. Having considered all of the factors set out in Alabama Code [1975,] Section 30-2-57, the Court expressly finds that the wife's separate estate is insufficient to enable her to acquire the ability to preserve, to the extent possible, the economic status quo of the parties as [it] existed during the marriage, that the husband has the ability to supply those means without undue economic hardship, and [that] the circumstances of this case make it equitable. Additionally, the Court expressly finds that rehabilitative alimony is not feasible to allow the wife to maintain the economic status quo as it existed during the marriage or to acquire the ability to do so.

7

> Accordingly, the Court does order the husband to pay periodic alimony to the wife in the amount of $2,000.00 per month[.] … The husband's obligation pursuant to this paragraph shall terminate upon the … wife's remarriage, the wife's cohabitation as that term is defined in Alabama Code [1975,] Section 30-2-55, or upon the death of either party."

Finally, "[t]he Court denie[d] any other relief requested by either party."

On July 31, 2023, the husband timely filed a motion to alter, amend, or vacate the judgment, challenging the sufficiency of the evidence to support three aspects of the judgment: (1) the trial court's finding of contempt, (2) the award of $121,693.54 to the wife, and (3) the award of periodic alimony to the wife. After a hearing, the trial court entered an amended judgment on October 27, 2023. The amended judgment, though it offered additional reasoning, affirmed all aspects of the original judgment except for the award of periodic alimony, which it reduced from $2,000 per month to $1,315 per month. The husband timely filed a notice of appeal to this court on December 7, 2023.

<u>Evidence</u>

The wife testified that the parties had been married on August 25, 2000, and clarified that her complaint, which stated that the parties had been married on September 23, 2000, was incorrect. Two children were

born of the parties' marriage: one who had attained the age of majority by the date of the trial and one who was born on July 27, 2012, and remained a minor. The wife testified that both children were living with her at the time of the trial.

The wife testified that the husband had opened his first used-car dealership, Select Auto, LLC, in 2009, and that, in the same year, she had graduated from college and earned her license to teach. The husband later opened two other used-car dealerships, Select Auto Group, LLC, and Select Auto Luxury, LLC. The wife stated that she had been employed as a teacher since 2009 and that, at the time of the trial, she was employed by the Mobile County public-school system.

According to the wife, the marriage had failed "because of [the] husband's physical and verbal abuse towards [her], his physical and verbal abuse towards [her] in front of the children, his drug use, his alcohol use, infidelity, [and] his controlling behavior." The wife testified that the marriage "started to go downhill in 2009." She stated that, in 2009, the husband had begun "this pattern of going out all night, turning off his phone so that [the wife] couldn't get in touch with him and just coming in the early morning hours without … telling [the wife] where he

was at or what he had been doing." The wife testified that the husband had used cocaine from 2009 to 2021.

The wife testified about a specific instance in which she had received a text message from the husband's sister containing a mugshot of the husband that had been taken after he had been arrested for patronizing a prostitute. The wife stated that, when she had confronted the husband about the mugshot, he had told her that, while he had been at work after hours, "a woman had come in and he thought she was homeless and he gave her money to make her leave, but it was a sting and [law enforcement officers] came in and arrested him for it."

The wife testified that the arrest had never come up between them again. However, she stated that it

> "started a string of events [from 2009 to 2012] of the same thing, not coming home, turning off his phone. If I were to ask [the husband] about where he was at[,] he would start to go into a rage and start throwing things off the counter, throwing food, like, just punching holes in the wall. And if I would go into the bedroom to get away[,] he would just bust in the door and he would spit on me."

According to the wife, during that period, the husband "damaged the [marital home]."

The wife testified that "the next major event was in 2013." She stated that, one early morning after the husband had arrived home intoxicated, she had confronted him with a photograph of a woman she had found on his phone and makeup that she had found on his clothes, and "he became enraged and pushed [her]." According to the wife, when she was pushed, she fell backwards onto her left hand, which got "bruised and swollen," and when she went to an Urgent Care for treatment, she learned that her ring finger had been broken. The wife testified that she had had surgery on her finger but that she still had problems with it. The wife stated that "[t]hat was the first time [the husband] had physically assaulted [her]."

The wife testified that, throughout 2013, 2014, and 2015, the husband had spit on her, "throw[n] tables over, TV stands over, flip[ped] couches, throw[n] things at [her]," including bottles, cups, and a TV remote, and punched walls. During the trial, the wife introduced several images of bruises, scratches, and other marks on her body that she testified had been caused by the husband. She testified about two specific instances, both of which had occurred on early mornings in 2015 while the husband had appeared intoxicated. On the first occasion, the

11

husband had shoved her into a hard corner of the couch, grabbed her by the neck, put her on the floor, and kicked and hit her, bruising her in the process. On the second occasion, when she had gotten up from the floor after being kicked and hit by the husband, he had "slammed [her] against the wall," hit her "in the side of the head," and "hit [her] in the face with his fist," resulting in a visit to Urgent Care, a "major headache," and "constant ringing in [her] ear" for "a couple of days." The wife also testified that, on one night in October 2020, after the husband had arrived home at "about four o'clock in the morning," he had attacked the wife while she was in bed with their then seven-year-old son, "almost hitting" the child with his fist and "waking [the child] up."

The husband, on the other hand, denied having ever caused injury to the wife and specifically denied having caused the marks shown in the wife's exhibits and the injuries about which she testified. He stated that all of the wife's photographs purporting to show her injuries and marks on her body were "fabricated."

The husband testified that the wife had attacked him with a knife on several occasions. He stated that, in one instance, after he had arrived home late at night and intoxicated, the wife had instigated a fight with

him, thrown furniture at him, and chased him with a knife. He stated that he had broken his arm during that altercation and that he had gone to the hospital as a result. The wife denied that that incident had ever taken place.

The wife introduced a photograph of two broken laptops; she testified that the laptops had belonged to her and that the husband had broken them. She also introduced a photograph of her closet with her clothes ripped up and strewn across the floor and testified that the husband had ripped the clothes. She further testified that, on several occasions "over the course of the years," the husband had put her ripped clothes in the toilet and had urinated on them. She introduced what appeared to be screenshots of text messages exchanged between her and the husband, which included a photograph she was sent by the husband, which she testified showed "[her] torn clothing in the toilet."

The wife also introduced a photograph of the drawers in the parties' bathroom broken off of their hinges; a photograph of numerous personal items, which she testified had belonged to her, broken and piled in a corner of the parties' bathroom; a photograph of a broken television that she testified had belonged to one of the parties' children; a photograph of

13

the parties' living room with the lamps and rugs thrown about; and a photograph of the parties' kitchen cabinets broken off of their hinges and with the words "white trash" written on them in her makeup. The wife testified that the husband had caused all the destruction depicted in those photographs. With respect to the aforementioned property damage, the husband generally testified that he could not recall whether he had caused the damage.

The wife testified that the husband had been convicted of driving under the influence. According to the husband, the charge for driving under the influence had been dismissed after he had participated in a diversion program. The wife introduced into evidence a photograph, which she testified she had taken sometime between 2010 and 2015, of the husband, who had "passed out, couldn't walk[,] and just flopped onto the floor." The husband admitted that he had come home and had passed out from drinking and drug use "a couple of times" throughout the marriage. He also admitted that, after abstaining from drinking alcohol for a few months, he had begun drinking "occasionally" again. The husband testified that his alcohol use had contributed to the problems in the marriage. Although he admitted that he had used cocaine "for a year,

14

maybe year and a half," he testified that, at the time of the trial, he was not using any drugs.

The wife stated that the husband had made "demeaning" remarks towards her and had called her "vile names." She introduced what she testified were screenshots of text messages exchanged between her and the husband, in which he called her, among other things, a "whore," "stupid," and "garbage." The wife testified that the husband had told their younger child that the wife was "a bitch" and that the younger child "deserve[d] a better mom." The wife also testified that the husband had once told her that, if she ever filed for divorce, she would be "sucking [expletive omitted] … for money" and told the children to "get ready to watch your mom on her knees."

According to the wife, the husband had not complied with the trial court's pretrial order and had continued to harass her since she filed for a divorce. The husband admitted that he had "[s]ometimes" yelled, screamed, or cursed at the wife. He stated that, "[m]aybe out of anger," he had told the wife that "dog shit" is worth more than her.

The wife testified that she had stayed with the husband because she was afraid of him. She stated that her stepfather had murdered her

15

mother and that the husband had "always said [the wife] would end up like [her mother]" and that the wife's mother had "deserved it." According to the wife, the husband "would say you're lucky it's not you yet," and "[y]ou Davis women know how to make men mad." The wife also testified that, in reference to the wife's mother, the husband had once said, "there was one less bitch in the world."

The wife testified that she had telephoned the police once, in 2015. According to the husband, the police once came to one of his car dealerships and arrested him, but the wife eventually dismissed the charge.

The wife testified that, in January 2021, the husband had told her that he had been patronizing prostitutes for 23 years. The husband admitted that he had made that statement. The wife introduced photographs of the husband with other women, which she testified were posted by the husband to "Facebook," a social-media platform, in December 2020. The husband admitted that he had appeared in photographs with women besides the wife, stating, "I wasn't happy in [the] marriage."

16

The wife testified that the husband had told her "[m]any, many, many times" that, if she filed for divorce, he would "draw it out as long as he could, … make it last seven years, … make sure it looks like he has nothing … make sure we get nothing … [and] make our lives miserable."

The wife testified that the husband had kept $200,000 in cash in a freezer in their home. According to the wife, the husband "would hand [her] the money, say here's another ten thousand, add it to the savings, and [she] would count it and wrap the ten thousand in foil and put it with the rest of the savings in the freezer." The wife introduced a video and still images taken from the video, which she testified depicted the $200,000 in cash and the husband moving the cash from its usual location shortly after she filed for a divorce. The husband denied that he had ever possessed $200,000 in cash at one time.

The wife testified that the marital home belonged to her, and that the title and the mortgage were solely in her name.[2] She requested that the home be sold and that she be awarded all of the equity of the home, approximately $126,000 per the wife's testimony, stating, "[b]ecause of

---

[2]The wife testified that the husband had claimed no ownership of the marital home. The wife introduced a discovery response, in which the husband stated that he "ha[d] no ownership [of] any properties."

17

everything he has put us through, I feel like that's the least that I deserve." The husband also testified that he wanted the marital home to be sold but requested that the equity be split equally between the parties because he had paid the mortgage payments and all the household expenses.

The wife testified that, when she had separated from the husband, he had owned two used-car dealerships: Select Auto, LLC, and Select Auto Group, LLC. Records kept by the Alabama Secretary of State and introduced into evidence by the wife reflect that the husband and his business partner, Mohanned Sultan, opened a third car dealership, Select Luxury, LLC, in June 2022. The wife testified that the husband's income from the three car dealerships was millions of dollars per year. Therefore, she stated that she wanted a property settlement in the amount of $250,000 representing her share of the value of the businesses.

The wife testified that the husband had transferred part of his ownership of the two original businesses to his partner, Sultan, during the pendency of the divorce, without permission from the trial court. Although the husband did not admit to transferring his interest, the parties stipulated based on the tax records admitted into evidence that,

18

at the time of the filing of the complaint for a divorce, the husband owned 100% of Select Auto Group, LLC, but that, at the time of the trial, he owned only 49% of that business, and Sultan owned 51%. The husband admitted that Sultan had not compensated him financially for that interest, saying that the consideration was Sultan's work and effort. The parties also stipulated that the husband's ownership of Select Auto, LLC, before 2022 was 100%; that it was, at the time of the trial, 49%; and that Sultan had been given 51%. As to Select Luxury, LLC, the third business, the parties stipulated that the husband had always owned 50% of that business and that Sultan had always owned the other 50%.

The wife stated that she owned a 2015 GMC Yukon automobile and that the husband owned a 2018 Lexus LS automobile. According to the wife, she had a retirement account with a balance of $48,000, and the husband did not have a retirement account. The husband requested half of the wife's retirement account.

The wife admitted that the husband had paid roughly $125,000 of her expenses over the year and a half since she filed the complaint for a divorce. However, she stated that, although she had provided copies of the bills to the husband's attorney every month since filing for the

19

divorce, the husband, in violation of the trial court's pretrial order to maintain the status quo, had failed to pay certain bills that he had paid during the marriage. The wife testified that she had been able to pay some bills, but that the bills for two services, one provided by Dish Network and the other provided by AT&T, had not been paid, and that these services had been suspended as a result of the nonpayment. The wife also testified that the husband had failed to reimburse her for any of the expenses for which she had sent him receipts, which included the cost of repairing the damage to their home that, she testified, the husband had caused; the cost of repairing her car; the cost of replacing the household washer and dryer; and the cost of orthodontic treatment for the minor child.

The wife stated that, from the date she filed the complaint for a divorce until the date of the trial, the husband had given her "a total of $3,500" in cash, mainly towards the beginning of the process. According to the wife, the total amount in reimbursements that she had not yet been paid (as of the date of the trial) was $55,427.10. When the husband's attorney pointed out that the expenses for which the wife had requested reimbursement included the cost of her gasoline and hair and nail care,

20

the wife maintained that these expenses had been paid by the husband during the marriage. The wife further testified that she was eventually unable to have her nails done because she could not afford that service.

According to the husband, however, the wife

"used to pay for her own stuff. She used to make money. She had a job. She made $2700. I paid the grocery, I pa[id] all the utilities, the rent, the major stuff, but I never paid her money for her to do her hair for instance or the nails, gas money from time to time but it wasn't a habit because she work and she makes money. So she used to spend her money too from time to time."

With respect to how her income was spent during the marriage, the wife testified as follows: "My money could go for … whatever I want[ed], clothing, whatever. If I was out with the kids[,] I got them fast food."

The wife testified that, as of the date of the trial, her net monthly income from her employment as a teacher was $3,382.95. She stated that she had earned less during the marriage but that she had taken on additional work since filing the complaint for a divorce.[3]

---

[3]The wife's paystub for her paycheck dated May 31, 2023, confirmed her net pay as $3,382.95. The paystubs for her paychecks in January, February, and March 2021 indicated net monthly pay in the amount of $2,702.24.

The wife introduced a document, which she had prepared, listing the monthly expenses that the husband had paid prior to her filing the complaint for a divorce. The monthly expenses total $4,659.71 and include the following: a mortgage payment in the amount of $1,803.51; electricity expenses in the amount of $296.82; other utility expenses in the amount of $83.72; pest-control expenses in the amount of $59.50; a bill from the Dish Network in the amount of $167.47; cellular-telephone expenses in the amount of $453.25; water-delivery expenses in the amount of $400; storage in the amount of $175; internet charges in the amount of $80.49; security charges in the amount of $36.95; sanitation expenses in the amount of $23; credit card bills in the amount of $500; and lawn-care expenses in the amount of $120. The exhibit also lists monthly expenses for childcare in the amount of $520.

The exhibit states that the list does not include the cost of the wife's groceries, gasoline, clothing, and "day to day living expenses," which she testified that the husband had paid during the marriage. The wife further testified that the list did not include her monthly expenses for automobile insurance, and that, during the marriage, the husband had also paid for her nail care, hair care, and cosmetics. The wife testified

that she could not maintain the economic status quo without financial assistance from the husband. The wife requested $4,600 per month in alimony.

According to the husband's tax returns, his total income was $135,732 in 2020; $168,908 in 2021; and $73,060 in 2022.[4] The wife introduced into evidence the husband's Schedule C "Profit or Loss Statements" from 2020 and 2021 for each of his businesses. The 2020 Profit or Loss Statement for Select Auto, LLC, reflected gross receipts in the amount of $3,774,166, gross income in the amount of $225,344, and net profits in the amount of $92,033. The 2020 Profit or Loss Statement for the business Select Auto Group, LLC, reflected gross receipts in the amount of $2,311,461, gross income in the amount of $128,568, and net profits in the amount of $43,699. The 2021 Profit or Loss statement for Select Auto, LLC, reflected gross receipts in the amount of $4,835,417, gross income in the amount of $313,218, and net profits in the amount of $117,439. The 2021 Profit or Loss Statement for Select Auto Group, LLC,

---

[4]The husband's 2020 and 2021 tax returns reflected a filing status of married filing separately.

23

reflected gross receipts in the amount of $4,447,596, gross income in the amount of $274,920, and net profits in the amount of $51,469.

In contrast, in 2022, on a Schedule E form for "[r]ental real estate, royalties, partnerships, S corporations, trusts, etc.," the husband reported his total income from all three of his businesses as $23,060. To explain the drastic drop in his business income in 2022, the husband testified: "It was a bad year." The only other income the husband reported in 2022 was on a Schedule C "Profit or Loss Statement." He reported that he had earned $50,000 from a business named "Fadi A Aludihi," a "used car broker auto sales" business. No further details were provided at trial about this business. Notably, however, the husband testified that he had received $50,000 in profits from Select Auto, LLC, in 2022.

The husband admitted that his partner, Sultan, had sold automobiles internationally; however, he stated that Sultan had made those sales "[f]or himself" through the name "Transatlantic Shipping," and that he had not loaned Sultan any money for the venture nor had he profited from the sales. However, the husband answered "yes" when

asked whether Sultan was "using [the husband's] company" to make the international sales.

The husband testified that he was "not sure" whether income from Sultan's international sales had been reported in the husband's tax filings. The wife introduced a check in the amount of $1,700 from Select Auto, LLC, to Sultan dated November 6, 2015, and labeled "For Loan," as well as a check in the amount of $25,950 from Sultan's sister to Select Auto, LLC, dated November 6, 2015, and labeled "For Vin #" and listing several VIN numbers.

The wife testified that, during the parties' marriage, she had completed the taxes for Select Auto, LLC. According to the wife, Select Auto, LLC, had not paid taxes on its employees, and the husband had spent $8,000 from a business account on gambling. Additionally, the wife testified that the husband had used the business checking accounts for all of the parties' expenses (including gasoline, the wife's makeup, and purchases on the Web site amazon.com), as well as for the parties' vacations. At the trial, the wife introduced a discovery response submitted by the husband, in which he admitted that he had no personal bank accounts.

25

The husband testified that he had "[s]ometimes" paid his personal expenses with his business accounts, but he denied having paid all of his expenses from his business accounts. He also testified that four or five months before the trial, he had opened a personal checking account.

The husband testified that his rent at the time of the trial was almost $1,800 and that, with utilities, he paid approximately $2,300 or $2,400 per month. The husband testified that, as of the date of the trial, his income was $800 per week, totaling approximately $3,400 per month, or $41,600 per year.

## Standard of Review

"'In reviewing a trial court's judgment in a divorce case where the trial court has made findings of fact based on oral testimony, we are governed by the ore tenus rule. Under this rule, the trial court's judgment based on those findings will be presumed correct and will not be disturbed on appeal unless it is plainly and palpably wrong. Hartzell v. Hartzell, 623 So. 2d 323 (Ala. Civ. App. 1993). Matters of alimony and property division are interrelated, and the entire judgment must be considered in determining whether the trial court abused its discretion as to either of those issues. Willing v. Willing, 655 So. 2d 1064 (Ala. Civ. App. 1995). … Moreover, in Kluever v. Kluever, 656 So. 2d 887 (Ala. Civ. App. 1995), this court stated, "[a]lthough this court is not permitted to substitute its judgment for that of the trial court, this court is permitted to review and revise the

26

trial court's judgment upon an abuse of discretion." Id. at 889.'

"Langley v. Langley, 895 So. 2d 971, 973 (Ala. Civ. App. 2003). 'Trial judges enjoy broad discretion in divorce cases, and their decisions are to be overturned on appeal only when they are "unsupported by the evidence or [are] otherwise palpably wrong."' Ex parte Bland, 796 So. 2d 340, 344 (Ala. 2000) (quoting Ex parte Jackson, 567 So. 2d 867, 868 (Ala. 1990))."

Cottom v. Cottom, 275 So. 3d 1158, 1163 (Ala. Civ. App. 2018).

## Discussion

Upon granting a divorce, a trial court may award rehabilitative or periodic alimony to a party to "enable the party to acquire the ability to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage." Ala. Code 1975, § 30-2-57(a)(1). However, a court may only do so if it makes three express findings: (1) that "[a] party lacks a separate estate or his or her separate estate is insufficient to enable the party to acquire the ability to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage"; (2) that "[t]he other party has the ability to supply those means without undue economic hardship"; and (3) that "[t]he circumstances of the case make it equitable." Ala. Code 1975, §§ 30-2-57(a)(1)-(3).

27

Here, the trial court made each of those findings; however, the husband argues that those findings were not supported by the evidence. He also argues that, even if alimony is warranted and equitable, the trial court erred in awarding periodic alimony instead of rehabilitative alimony, and that, even if periodic alimony were justified, it should have been limited by the length of the marriage.

I.

We first address the husband's argument that the wife's property settlement is sufficient to enable her to maintain the economic status quo without alimony. Section 30-2-57(d), Ala. Code 1975, provides:

> "In determining whether a party has a sufficient separate estate to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage, the court shall consider any and all relevant evidence, including all of the following:
>
>> "(1) The party's own individual assets.
>>
>> "(2) The marital property received by or awarded to the party.
>>
>> "(3) The liabilities of the party following the distribution of marital property.
>>
>> "(4) The party's own wage-earning capacity, taking into account the age, health, education, and work experience of the party as well as the prevailing economic conditions.

"(5) Any benefits that will assist the party in obtaining and maintaining gainful employment.

"(6) That the party has primary physical custody of a child of the marriage whose condition or circumstances make it appropriate that the party not be required to seek employment outside the home.

"(7) Any other factor the court deems equitable under the circumstances of the case."

After the trial court's property division, the wife's property consisted of the following: the marital home, which was encumbered by a mortgage; the 2015 GMC Yukon automobile; her retirement account with a balance of approximately $48,000; an award of $14,693.54 in unpaid status quo expenses; and $100,000 representing her 50% share of the $200,000 that the husband kept in cash. According to the wife's exhibit 36 ("the expense exhibit"), her monthly expenses total $4,659.71. Subtracting the $520 in childcare expenses that are listed, her expenses total $4,139.71.[5] Considering those listed expenses alone and the wife's

---

[5]We have not considered the childcare expenses in the wife's expenses because those expenses relate solely to the parties' minor child and would be more appropriately addressed in the award of child support. See, e.g., Kean v. Kean, 189 So. 3d 61, 66 n.3 (Ala. Civ. App. 2015) (stating that the award of child support would address some of the childcare costs). Moreover, we note that the Form CS-42 prepared by the trial court

net monthly income in the amount of $3,382.95, the wife will have a monthly deficit in the amount of $756.76. Moreover, in addition to the expenses listed on the wife's expense exhibit, she testified that, to maintain the standard of living that existed during the marriage, she incurs expenses for groceries, gasoline, clothing, automobile insurance, nail care, hair care, and cosmetics. The wife requested periodic alimony in the amount of $4,600 per month, which approximates the amount of monthly bills that, she testified, the husband had paid during the marriage. The trial court awarded her $1,315 per month.

The wife has been a public-school teacher since 2009, and the evidence indicated that she had taken on additional job duties to increase her net monthly income to the amount of $3,382.95. However, even with the increase in income, her income is insufficient to maintain the standard of living that she enjoyed during the marriage. Without alimony, the only assets the wife has to cover her monthly deficit are the equity of the home, the value of her automobile, her retirement account, and the cash award of $100,000. However, this court has held that "[t]he

---

indicated that the parties do not incur work-related childcare costs. We will not discuss child support because it is not at issue in this appeal.

wife should not be compelled to consume the principal of her property-distribution award in order to maintain the lifestyle to which she had become accustomed during the marriage." Kean v. Kean, 189 So. 3d 61, 67 (Ala. Civ. App. 2015).

Considering the foregoing evidence as it relates to the statutory factors, we conclude that the trial court's specific finding that "the wife's separate estate is insufficient to enable her to acquire the ability to preserve, to the extent possible, the economic status quo of the parties as [it] existed during the marriage" was supported by the evidence.

## II.

The husband also argues that the alimony award exceeds his ability to pay. We initially note that, within this section of argument in his brief, the husband focuses on his contention that, considering the awards of child support and alimony, the wife's income is higher than his income. This argument misses the mark. Once it has been determined that a party requires alimony, the next question posed by Ala. Code 1975, § 30-2-57(a), is whether the other party can afford to pay alimony; the statute does not task the trial court with comparing the parties' incomes.

Section 30-2-57(e), Ala. Code 1975, addresses a spouse's ability to pay alimony as follows:

"In determining whether the other party has the ability to pay alimony, the court shall consider any and all evidence, including all of the following:

"(1) His or her own individual assets, except those assets protected from use for the payment of alimony by federal law.

"(2) The marital property received by or awarded to him or her.

"(3) His or her liabilities following the distribution of marital property.

"(4) His or her net income.

"(5) His or her wage-earning ability, considering his or her age, health, education, professional licensing, work history, family commitments, and prevailing economic conditions.

"(6) That he or she has primary physical custody of a child of the marriage whose condition or circumstances make it appropriate that he or she not be required to maintain employment outside the home.

"(7) Any other factor the court deems equitable under the circumstances of the case.

After the trial court's property division, the husband's property consisted of the following: his entire interest in the three used-car

dealerships, his 2018 Lexus LS500 automobile, and $100,000 in cash. The trial court's judgment ordered the husband to pay $14,693.54 to the wife in unpaid status quo expenses, $7,000 towards the wife's attorney's fees, and $1,500 to the guardian ad litem. The judgment also required the husband to pay monthly alimony in the amount of $1,315 and monthly child support in the amount of $683; he was also required to maintain a subscription to a Soberlink "Monthly Monitoring Plan" at the cost of approximately $100 to $150 per month, which will monitor his intoxication levels during his visits with the parties' minor child. The husband testified that his rent and utility expenses totaled $2,300 or $2,400 per month.

The husband states in his brief that his monthly income is $6,088[6] (presumably based on his 2022 tax return, in which he claimed that his income that year totaled $73,060[7]) and argues that he cannot afford to comply with the trial court's alimony award. The husband points out that, with respect to his income, the trial court, in its amended judgment,

---

[6]The husband appears to have abandoned his testimony that he earns only $800 per week, totaling approximately $3,400 per month.

[7]$73,060 divided by 12 months equals $6,088 per month.

33

stated that it had "used the $73,060 that the [husband] claimed as his 2022 income in calculating the child support guidelines." However, we note that the trial court also explained that

> "[t]he Court found the [husband's] testimony about his income to be wholly without credibility. The Court note[d] that the [husband] disposed of approximately half the ownership interest of his various car dealerships while this case was pending and in violation of this Court's pretrial Order. That amount of income [reported in 2022] is also roughly half of the income he showed in 2021. The Court f[ound] that the [husband] was intentionally attempting to reduce or obfuscate his income in order to reduce the amount of support this Court might Order him to pay."

In light of those findings, the trial court's amended judgment noted that it "reaffirm[ed] child support in the amount of $683 per month even though the Court f[ound] this amount lower than called for under Rule 32[, Ala. R. Jud. Admin.], if based on the [husband's] actual income," because, it reasoned, the husband's actual income is "a figure that is extremely difficult to pinpoint with specificity in light of the evidence presented."

> "In determining the weight to be accorded testimony, the trial court, as sole judge of the credibility of witnesses, considers the demeanor and apparent candor or evasiveness of the witnesses, and the trial court may disbelieve and disregard portions of testimony and should accept only that testimony it considers worthy of belief."

34

Bunn v. Bunn, 628 So. 2d 695, 697 (Ala. Civ. App. 1993). In Meehan v. Meehan, 249 So. 3d 1120, 1130 (Ala. Civ. App. 2017), we stated that "[t]he trial court, having received ore tenus testimony from the husband, could have concluded that the husband was not forthcoming with his true financial situation and that he had the ability to pay the ordered alimony." Similarly, in the present case, the record supported the trial court's finding that the husband's income, and thus his wage-earning ability, was higher than he had claimed, and the trial court "could have concluded that the husband was not forthcoming with his true financial situation." Id.

The drastic, conveniently timed, and inexplicable decrease in the husband's income in the year before the trial (reflected on tax returns that were significantly delayed in being prepared), combined with the husband's contemptuous transfer of assets during the pendency of the divorce (altering two of his businesses from sole proprietorships to partnerships, lessening his interest in them) and the husband's immediate removal of the $200,000 in cash from where the wife could access it upon the divorce filing, support the trial court's finding that the husband's evidence of his income was unreliable. Therefore, the trial

court did not err in awarding alimony based on a different income figure than the husband had claimed on his 2022 tax return, even though the court had based its child-support calculation on the tax return.

According to the husband's tax returns, his annual income was approximately $135,000 in 2020 and $168,000 in 2021, which translates to a monthly income of $11,250 in 2020 and $14,000 in 2021. The trial court, in finding that the husband had deliberately reduced his income after the divorce filing, could have determined that the amount of income reported on the husband's 2020 and 2021 tax returns more accurately reflected his income and wage-earning ability than the 2022 return or the husband's testimony at the trial. Even considering the lesser amount of $11,250 per month from 2020, the husband would still be left with $6,702 per month after paying his rent, utilities, Soberlink subscription cost, and periodic-alimony and child-support obligations (assuming the husband's highest estimations of those costs are correct).

Considering the foregoing evidence as it relates to the statutory factors, we conclude that the trial court's specific finding that the husband could afford the alimony award is supported by the evidence.

III.

Turning to the issue of whether the award of periodic alimony is equitable, § 30-2-57(f), Ala. Code 1975, provides:

"In determining whether the award of rehabilitative or periodic alimony is equitable, the court shall consider all relevant factors including all of the following:

"(1) The length of the marriage.

"(2) The standard of living to which the parties became accustomed during the marriage.

"(3) The relative fault of the parties for the breakdown of the marriage.

"(4) The age and health of the parties.

"(5) The future employment prospects of the parties.

"(6) The contribution of the one party to the education or earning ability of the other party.

"(7) The extent to which one party reduced his or her income or career opportunities for the benefit of the other party or the family.

"(8) Excessive or abnormal expenditures, destruction, concealment, or fraudulent disposition of property.

"(9) All actual damages and judgments from conduct resulting in criminal conviction of either spouse in which the other spouse or child of the marriage was the victim.

37

"(10) Any other factor the court deems equitable under the circumstances of the case."

The parties had been married for over 20 years when the complaint for a divorce was filed. The evidence indicates that, up to that point, the parties had enjoyed a comfortable standard of living, with most of the parties' expenses, including the wife's hair care and nail care expenses, having been covered by the husband's income. With respect to the fault in the marriage, the record was replete with detailed testimony and documentary evidence concerning the husband's physical and verbal abuse, the husband's alcohol and drug use, and the husband's infidelity, all of which, the wife testified, had contributed to the breakdown of the parties' marriage.

Though there was no evidence presented at the trial concerning the parties' ages, there was no evidence indicating that either party was in poor health. Both parties are employed, but the husband has a higher earning capacity as a business owner than the wife as a public-school teacher.

With respect to the factor concerning the "destruction, concealment, or fraudulent disposition of property," the trial court found that the

38

husband had "transferred his interest in Select Auto, LLC and Select Auto Group, LLC after the divorce was filed. … Further, … the husband removed $200,000.00 cash from the marital residence and … such cash [wa]s a marital asset subject to division by [the trial court]."

Based on the foregoing evidence as it relates to the statutory factors, we conclude that the trial court's finding, that the award of periodic alimony is equitable considering the "circumstances of this case," is supported by the evidence.

## IV.

The husband argues that the trial court "failed to find facts justifying deviation from the default award of rehabilitative alimony" to award periodic alimony instead. We note, however, that the trial court expressly made each of the findings required by the statute, and there was evidence to support each finding.

Pursuant to § 30-2-57(b)(2), Ala. Code 1975, after the requirements of § 30-2-57(a) are met, periodic alimony may be awarded only

> "[i]n cases in which the court expressly finds that rehabilitation is not feasible, a good-faith attempt at rehabilitation fails, or good-faith rehabilitation only enables the party to partially acquire the ability to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage."

39

The trial court's judgment stated: "the Court expressly finds that rehabilitative alimony is not feasible to allow the wife to maintain the economic status quo as it existed during the marriage or to acquire the ability to do so." That finding is supported by the evidence discussed previously concerning the wife's need for periodic alimony, the husband's ability to pay periodic alimony, and the equitability of the periodic-alimony award.[8] We specifically note that, despite the wife having a teaching degree and having taken on additional duties since she filed the complaint for a divorce, the wife was still unable to maintain the standard of living that she had enjoyed during the 20-year marriage with her income alone. Therefore, we conclude that the husband's argument on this point has no merit.

---

[8]We note that the husband's brief addresses the equitability of the periodic-alimony award in the same section as his argument concerning whether rehabilitative alimony is feasible. Because this opinion has already addressed the equitability of the periodic-alimony award, we will not repeat an analysis of that issue here.

V.

Lastly, the husband argues that the duration of the trial court's alimony award exceeds the statutory limit. Section 30-2-57(g), Ala. Code 1975, provides:

> "Except upon a finding by the court that a deviation from the time limits of this section is equitably required, a person shall be eligible for periodic alimony for a period not to exceed the length of the marriage, as of the date of the filing of the complaint, with the exception that if a party is married for 20 years or longer, there shall be no time limit as to his or her eligibility."

The trial court specifically found that, at the time of the filing of the divorce complaint, the parties had been married for 20 years and 5 months (since August 25, 2000). The husband concedes in his brief that the parties have been married for over 20 years.[9] However, the husband argues that periodic alimony, if warranted, should have only been awarded for 244 months (20 years and 4 months), to correspond with the length of the marriage at the time of the filing of the divorce complaint.

---

[9]Although the husband's brief states that the parties were married on September 23, 2020, it also states that "this marriage barely exceeds [20 years]." We thus assume that the husband intended to write "2000" and that "2020" was a typographical error. Also, whether the marriage date was August 25 or September 23, 2000, the divorce complaint was still filed over 20 years later, on January 25, 2021.

41

We note, though, that such an extrapolation is not contemplated by § 30-2-57(g). Because the parties had been married for more than 20 years, there was no statutory time limit. As discussed previously, the evidence supported the trial court's findings that the wife established a need for periodic alimony, that the husband had the ability to pay periodic alimony, and that the periodic-alimony award was equitable.[10] Therefore, we conclude that the husband's argument on this point is without merit.

## Conclusion

Based on the foregoing, we affirm the trial court's judgment awarding periodic alimony to the wife.

AFFIRMED

Moore, P.J., and Edwards, Hanson, and Fridy, JJ., concur.

---

[10]We note that the husband's brief addresses the equitability of the periodic-alimony award and his ability to pay periodic alimony in the same section as his argument concerning the duration of his periodic-alimony obligation. Because this opinion has already addressed the equitability of the periodic-alimony award and the husband's ability to pay periodic alimony, we will not repeat an analysis of those issues here.